# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

United States of America,                                      Case No. 19-cr-110 (ADM/ECW)

        Plaintiff,

   v.                                                      **REPORT AND RECOMMENDATION**

Joseph Jay Brown,

        Defendant.

---

On April 16, 2018, Defendant Joseph Jay Brown ("Brown" or "Defendant") was indicted on seven counts of Aiding and Assisting in the Preparation of False Individual Income Tax Returns in violation of 26 U.S.C. § 7206(2).  (Dkt. 1.)  This matter is before the Court on Brown's Motion to Suppress Statements, Admissions, and Answers (Dkt. 22) and Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. 23).

The case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

On June 26, 2019, the Court held a hearing on the pretrial motions (Dkt. 29) in which the Government presented a witness and offered nine exhibits.

Brown filed a post-hearing brief on July 26, 2019 (Dkt. 37) and the Government filed its response brief on August 29, 2019 (Dkt. 42).  For the reasons stated below, the Court recommends that the Motion to Suppress Statements, Admissions, and Answers

(Dkt. 22) be denied and the Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. 23) be denied.

## I.    FACTUAL BACKGROUND

### A.    Search Warrant and Supporting Affidavit

At the June 26, 2019 hearing, Special Agent Marissa Pitzen ("SA Pitzen") of the Internal Revenue Service – Criminal Investigation ("IRS") testified about her tax return preparer investigation of Brown and the executed search warrant.  (Tr. 4.)[1]

The search warrant, signed by United States Magistrate Judge Steven E. Rau on June 10, 2015, permitted SA Pitzen and IRS agents to search Number 1 LLC ("Number 1 Tax"), a tax return business located in Minneapolis, Minnesota.  (*See generally* Gov't Ex. 1, App. for Search Warrant at 1.)  SA Pitzen supported the search warrant with an affidavit detailing her investigation into Number 1 Tax and Brown's activities.  (*See generally* Gov't Ex. 1, Aff. at 4-23.)

The supporting affidavit described the initial investigation by the IRS and stated:

> In 2013, a tax preparation business named EMR Tax Service was identified by the IRS's Scheme Development Center (SDC) as preparing questionable tax returns for their clients. . . .  [T]wo of the return preparers, Joseph Brown and Calvin Karn, subsequently left EMR Tax Service to start a new tax business, Number 1 Tax.  Number 1 Tax was up and running in 2014 in time for the filing of tax returns for the 2013 tax year.
>
> Articles of Incorporation for Number 1 LLC were filed by Joseph Brown with the Minnesota Secretary of State on or about August 12, 2013. . . .  Number 1 LLC was established with the IRS in 2013 and issued Employer Identification Number (EIN) 46-2748028.  The tax returns filed by Number

---

[1]    The transcript of the hearing ("Tr.") is filed at Docket No. 34.

1 Tax all list an EIN that matches the digits of Brown's social security number. Calvin Karn is listed as the contact for the business. Number 1 Tax has never filed payroll tax returns with the IRS. Business income for Number 1 Tax appears to be reported as self-employment income on the individual return preparer's tax returns . . . .

The evidence developed to date in this investigation reveals that there are three Tax Return Preparers working at Number 1 Tax: Joseph Brown, Calvin Karn, and Kyesha Williams. Together they filed more than 450 federal individual income tax returns with the IRS for the tax years 2013 and 2014 during the respective 2014 and 2015 filing seasons. The tax returns were submitted electronically to the IRS using an Electronic Filing Identification Number (EFIN) issued by the IRS. . . .

The EFIN listed on the tax returns submitted to the IRS by Number 1 Tax during the 2014 and 2015 filing seasons is registered to Joseph Brown and Calvin Karn as co-owners of Number 1 LLC. . . .

Brown, Karn, and Williams each list their individual PTIN's [Preparer Identification Numbers] for the tax returns they prepared. Approximately one-half of all the tax returns filed through Number 1 Tax during the 2014 and 2015 filings seasons were signed by Brown. Karn signed nearly 40 percent; and Williams signed the remaining 10 percent of the returns transmitted by Number 1 Tax to the IRS during the 2014 and 2015 filing seasons.

Number 1 Tax has one known location at 2038B West Broadway Avenue N. in Minneapolis, Minnesota. The first tax returns transmitted to the IRS by Number 1 Tax were during the 2014 filing season. In late 2014, the IRS SDC identified a number of tax returns being transmitted by Number 1 Tax. These returns contained questionable information and indications of fraud that resembled the suspicious returns prepared by EMR Tax Service that had previously been identified by the SDC. . . . Specifically, the SDC noted the high volume of returns resulting in refund originating from Number 1 Tax; 98 percent for the 2014 filing season. The SDC also noted the high volume of tax returns filed by Number 1 Tax claiming the Earned Income Tax Credit (EITC); 69 percent for the 2014 filing season. Many of these tax returns contain Schedule C or "Self Employment" income from a trade or business. "Self Employment" income is often reported on a Schedule C, Profit or Loss From Business, and attached to the individual income tax return. The total net profit/loss from the Schedule C is reported in the income section of the individual income tax return and is a component that makes up the total earned income for an individual(s). Based on your affiant's experience,

3

reporting false Schedule C business income is a common method that unscrupulous tax return preparers use to increase their clients' refunds by manipulating the earned income of the client in order to increase or qualify clients for refundable credits such as the American Opportunity Credit, the Child Tax Credits, and EITC, all of which are based, in part, on the amount of earned income a taxpayer reports.

I analyzed the tax return data for the tax returns filed by Number 1 Tax in the 2014 filing season and determined that 42 percent of the tax returns filed by Number 1 Tax included one or more Schedule C businesses. I also noticed the following:

a)  Nearly all of the tax returns that filed with Schedule C businesses also claimed the EITC and in most instances qualified for a higher amount of EITC because of the amount of business income reported.

b)  More than half of the total returns filed by Number 1 Tax claiming EITC also claimed to have Schedule C business income.

c)  Of the approximately 110 Schedule C businesses, 43 are hair businesses (Hair Stylist, Barber, Hair Braider).  All three return preparers prepared returns containing these Schedule C hair businesses.  Other common businesses listed include cleaning service or housekeeping businesses and daycare businesses.

d)  A comparison of the W-2 wage and withholding amounts claimed on Number 1 Tax clients' tax returns with the information reported by the W-2 employers reveals that 93 tax returns reported wages and/or withholding amounts that do not verify with the employer data the IRS has on file. Although there are a number of reasons why these data may not match up, such as a client failing to provide their preparer with one or more of their Forms W-2, at least 25 of these tax returns reported higher wages or withholdings than those reported to the IRS by the employer.  This indicates that additional W-2 income or withholding was added to the client's tax return. In many instances this increased the amount of federal tax withholdings refunded or increased the earned income of the client enough to qualify them for a higher refundable credit, thus increasing their tax refund.

e)  At least 40 percent of the tax returns filed by Number 1 Tax in 2014 claim the refundable American Opportunity Credit.  This credit is a refundable tax credit for undergraduate college education expenses.

Analysis of the tax returns filed by Number 1 Tax in the 2015 filing season reveals similar characteristics as the previous year's returns. Approximately 28 percent of the returns filed contained Schedule C businesses. Other notable observations include:

a) Nearly all the tax returns that reported Schedule C businesses income also claimed the EITC and in most instances qualified for a higher amount of EITC because of the business income reported.

b) Approximately 36 percent of the returns filed claiming EITC also claimed to have Schedule C business income.

c) Of the approximately 80 Schedule C businesses, 39 are hair businesses. As in the previous year, other common businesses include cleaning services and housekeeping businesses.

d) A comparison of the wage and withholding amounts reported on the tax returns of Number 1 Tax's clients to the amounts reported by the employers has not been conducted for the 2014 tax returns that were filed this year because the IRS has not yet received the employer data necessary to conduct this comparison.

(*Id.* at 4-9.)

The affidavit next described an undercover operation that took place on January 27, 2015, which an IRS undercover agent ("UCA") had taxes prepared at Number 1 Tax.

(*Id.* at 9.) The affidavit stated:

During the recorded meeting, the UCA presented the return preparer, identified as Joseph Brown, with social security numbers for him/herself and his/her dependent children and a Form W-2 showing wages of $871. After preparing the UCA's tax return, Joseph Brown explained to the UCA that he had increased his/her wages so that he/she would receive a larger refund. The completed tax return provided to the UCA by Joseph Brown and filed with the IRS reported wages in the amount of $8,371 and was electronically filed from the EFIN belonging to Number 1 Tax.

After completing the tax return and having the UCA sign all of the authorizations and financial disclosures, Joseph Brown explained to the UCA that he increased his/her income a little but not too much. He told UCA that

5

because s/he had a W-2 it was easy for him to report extra income for him/her but that he didn't have to do it in a way where it was "self-employed".

When the UCA asked Joseph Brown what "self-employed" was, he explained to him/her that it was where you work for yourself and don't pay any taxes in. Brown stated that for the most part you have to prove your income with receipts, bank statements, and "stuff like that." Brown told the UCA he just added a couple extra thousand of income and that it was okay long as s/he had a W-2. Brown proceeded to offer to make the UCA receipts if "they" were to request that and that "it's not a big deal."

Brown explained to the UCA that the difference between increasing W-2 income and doing "self-employed" was that he/she would pay more for a "self-employed" return. Brown stated that his partners would have put "self-employed," but not him; he knows people want to save money. Brown told the UCA that Number 1 Tax was still cheaper than everybody else when it comes to self-employed and that they (Number 1 Tax) charge $500.

The federal tax refund claimed on the return prepared by Brown for the UCA totaled $4,575. Had a legitimate tax return been prepared for the UCA, his/her correct federal tax refund would have been $350. Because Brown inflated the UCA's income, this increased the amount of refundable credits, such as the EITC he/she was eligible to claim.

(*Id.* at 9-10.)

The affidavit explained that Brown also filed a Minnesota state tax return for the UCA using the same inflated wage amount, which resulted in a claimed state refund of $919, while a legitimate tax return would have generated a state refund of $94. (*Id.* at 10.) According to the affidavit, Brown "offered the UCA an opportunity to earn extra money by bringing in clients" and "provided the UCA with a Number 1 Tax Compensation Plan that detailed how much weekly pay and 'commission' the UCA would earn as a 'temporary' employee by the number of clients s/he brought in per week." (*Id.* at 11.)

After describing the undercover operation, the affidavit stated that the individual tax returns of Brown "include similar characteristics to the questionable returns filed by Brown and others at Number 1 Tax on behalf of their clients." (*Id.*) Along the same lines, the affidavit noted that Williams' 2014 federal tax return had "similarities to the false returns filed at Number 1 Tax" which qualified her to receive a tax refund of $6,709 based largely on the refundable EITC tax credit. (*Id.* at 12.) Moreover, education credits claimed on Karn's 2013 and 2014 jointly filed tax returns did not match IRS records and Karn's 2012 tax return claimed a tax refund "comprised entirely on false federal withholdings reported on [that] tax return." (*Id.* at 11.)

Magistrate Judge Rau found the application and supporting affidavit established probable cause for the search warrant and signed it on June 10, 2015. (Gov't Ex. 1, App. for Search Warrant at 1.) The warrant identified the items to be seized as "Attachment B" of SA Pitzen's affidavit application. (Gov't Ex. 1, Search Warrant at 1.) Attachment B from the affidavit describes the following items to be seized:

> This search warrant is requested for the property and evidence related to Number 1, LLC (hereinafter referred to as Number 1 Tax) for the time period of January 1, 2013 55411 [sic] through the current date and any other records maintained at 2038 B West Broadway Ave N 55, Minneapolis, Minnesota, for or related to Number 1 Tax and any other individuals, businesses or entities that relate to Number 1 Tax for the period January 1, 2013 to the present, all of which are evidence of violations of Title 26, United States Code, Section 7206(2), Aiding or Assisting the Preparation of a False or Fraudulent Document, Title 26, United States Code Section 7026(1), Declaration Under Penalties of Perjury, Title 18, United States Code Section 286, Conspiracy to Defraud the Government with Respect to Claims, and Title 18, United States Code Section 287, False, Fictitious, or Fraudulent Claims. The following evidentiary items are requested to be seized:

a. Client files, records of client's names and addresses, original and/or copies of client income tax returns.

b. Records reflecting the amount of income tax refunds claimed or received on client tax returns, including client files and questionnaires, U.S. Treasury checks (tax refunds), bank product applications and financial agreements, tax refund checks, check stubs, check receipts, check inquiries, and invoices.

c. Financial/net worth statements and documents relating to income and/or expenses to include but not limited to books, records, receipts, invoices, bank account records, account applications, deposit statements/slips, notes, checks, bank statements, bank books, check books, check registers, withdrawal slips, Certificate of Deposit (CD) documents, wire transfers, cashier's checks, money orders, financial statements, credit applications, loan documents, loan payments, loan statements, invoices and/or bills, journals, ledgers, credit card billing statements and receipts, calendars, billings, agreements, contracts, reference letters, currency, safe deposit box records and keys, and all records reflecting cash receipts and cash disbursements, and any other financial records relating to any of the above named entities.

d. Records of employees and return preparers of Number 1 Tax to include any tax returns, financial documents, or other documentation showing the identity of the employees and tax return preparers of Number 1 Tax.

e. Papers, tickets, notes, schedules, receipts, and other items which will show the disposition of income that relate to Number 1 Tax and employees and/or contractors of Number 1 Tax.

f. Payroll records for Number 1 Tax, including payroll ledgers, timecards, payroll checks, pay stubs, Forms W-2, W-3, and W-5, and Form 1099.

g. Corporate and individual federal and state income tax returns, forms, and attachments for the tax years 2013, and 2014, to include personal, business, and corporate returns which may have been prepared to file with the IRS, or for purposes other than filing with the IRS.

h. Documents reflecting the names, street addresses, and telephone number of any and all former and present employees and customers that relate to Number 1 Tax.

i. Books, manuals, brochures, and notes relating to taxation.

8

j. Work papers relating to the certification, preparation, and/or accumulation of financial data and tax return preparation, including all income and expense summaries, and income and expense organizers, client files and copies of all returns relating to each client.

k. Documents reflecting, referring, and/or relating to ownership and/or location of real property in the name of Number 1 Tax and/or return preparers working at or for Number 1 Tax, including but not limited to rental payments, lease agreements, business leases, land leases, building leases, options, exchange of title properties, grant deeds, bust deeds, quit claim deeds, or deeds held in trust, purchase/sale agreements, depreciation or amortization schedules, rental income and expense records, and any related correspondence.

l. Receipts or documents as it related to the purchase, lease or rent of assets by Number I Tax and/or return preparers working at or for Number 1 Tax. Assets are to include but not limited to watercrafts, vehicles, motorcycles, snowmobiles, condominiums, houses, apartments, offices, jewelry, stocks, and certificates of deposit.

m. Computers, and/or word processors.

n. Evidence of who used, owned, or controlled any electronic devices at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence; evidence indicating how and when electronic device was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user; evidence of the attachment to the electronic device of other storage devices or similar containers for electronic evidence; evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the electronic device; evidence of the times the electronic device was used; passwords, encryption keys, and other access devices that may be necessary to access the electronic device; documentation and manuals that may be necessary to access the electronic device or to conduct a forensic examination of the electronic device; records of or information about Internet Protocol addresses used by the electronic device; and contextual information necessary to understand the evidence described in this attachment.

o.  Any and all computer passwords and other data security devices designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code.

The terms "records" and "documents" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any electrical, electronic, or magnetic form (such as hard drives, CD-ROMs, optical discs, backup tapes, printer buffers, smart cards, memory calculators, thumb drives, personal digital assistants); and handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic or audio form (such as microfilm, microfiche, prints, slides, negatives, videotapes, photocopies, and audio cassettes).

(Gov't Ex. 1, Attachment B at 1-4.)

## B.    Special Agent Pitzen's Questioning of Brown

SA Pitzen and an IRS team executed the search warrant on June 11, 2015.  (Tr. 5.) SA Pitzen initially went to Number 1 Tax around 9:00 a.m., but it was closed.  (*Id.* at 6.) Consequently, she went to Mr. Brown's residence with Revenue Agent Paul Brewers ("RA Brewers") and Special Agent Tim Nichols ("SA Nichols") to obtain a key.  (*Id.*) Both SA Pitzen and SA Nichols were armed and wore IRS enforcement vests and jackets while RA Brewers wore normal business attire.  (*Id.* at 7.)

At Brown's residence, SA Pitzen explained to Brown that they had a search warrant for Number 1 Tax, showed him a copy of the search warrant, and asked him for a key.  (*Id.*)  SA Pitzen testified that she attempted to "talk to him about the business" and "ask him questions."  (*Id.* at 8.)  According to SA Pitzen, Brown's response was that he wanted to go to Number 1 Tax.  (*Id.*)  Brown then provided the agents with a key to the business.  (*Id.*)  SA Nichols drove back separately with the key to Number 1 Tax.  (*Id.*)

10

SA Pitzen and RA Brewers drove together while Brown drove his own vehicle to Number 1 Tax.  (*Id.*)

Shortly after 9:30 a.m., SA Pitzen arrived back at Number 1 Tax.  (*Id.* at 9.) Approximately thirteen IRS agents were at Number 1 Tax when she arrived, eleven of which were special agents.  (*Id.*)  SA Pitzen testified that the other special agents wore similar attire as SA Pitzen and SA Nichols and were armed.  (*Id.* at 9.)  The other personnel who were there to assist in the execution of the warrant were dressed like RA Brewers.  (*Id.* at 9.)  SA Pitzen testified that when she returned to Number 1 Tax, she met Brown at the rear of the building.  (*Id.* at 10; *see* Gov't Ex. 8 (showing rear of building).) Before entering the building, SA Nichols patted down Brown for officer safety.  (Tr. 10.) SA Pitzen stated that she did not believe anyone else was present when they cleared the building.  (*Id.* at 10-11.)  Brown was not restrained in any way.  (*Id.*)

After Number 1 Tax was cleared, SA Pitzen, RA Brewers, and Brown moved to the reception area located the front of the building.  (*Id.* at 11; *see* Gov't Exs. 2-3 (showing front of building).)  After sitting down, the other agents began the search.  (Tr. 16.)  SA Pitzen testified that she sat in the waiting area next to the reception area while speaking with Brown.  (*Id.* at 14; *see* Gov't Exs. 4-5 (showing reception area).)  SA Pitzen sat in a chair parallel to the front window of the business and Brown sat in the second chair from the front the front window.  (Tr. 14; *see* Gov't Ex. 3 (showing SA Pitzen and Brown seated in chairs).)  RA Brewers sat in a chair across from Brown and adjacent to SA Pitzen.  (Tr. 19.)  SA Pitzen testified that she believed no one was seated in a manner that blocked Brown's access to the door.  (*Id.* at 18.)

SA Pitzen testified that before the interview, she re-introduced herself to Brown and displayed her credentials. (*Id.* at 16.) She explained to Brown the nature of the charges and told him that she needed to read him his noncustodial rights before speaking to him further. (*Id.*) SA Pitzen then told Brown that she wanted to ask Brown some questions but did not recall whether Brown responded. (*Id.*) SA Pitzen proceeded to read Brown his noncustodial rights verbatim from a card kept in her credentials. (*Id.* at 17, 30; Gov't Ex. 9 (IRS "Non-Custody Statement of Rights").) SA Pitzen proceeded to ask Brown if he understood his rights. (*Id.* at 18.) Brown responded in the affirmative. (*Id.*) SA Pitzen "reiterated to Brown that he was not under arrest, he was free to leave or stay if he would like to stay, but if he chose to stay, that he wouldn't be allowed to freely wander around while we were conducting the search." (*Id.*)

The interview lasted about one hour and 45 minutes and the search lasted about ten minutes longer. (*Id.* at 19.) SA Pitzen testified that Brown did not seem confused at any point when she spoke to him about various details regarding Number 1 Tax or his preparation of tax returns for the business. (*Id.* at 20.) She testified that she did not use any deceptions or tricks during the interview, nor did she raise her voice or yell at Brown. (*Id.*) SA Pitzen never had her weapon drawn during the interview, nor did any of the other special agents. (*Id.* at 24.) She testified that at no point did Brown say he did not want to answer any more questions, say he wanted to end the interview, or say he wanted to talk to a lawyer. (*Id.* at 21.) SA Pitzen described the conversation with Brown as cordial. (*Id.*) SA Pitzen was unable to recall whether Brown asked to use the bathroom or for a drink of water during the interview, but if he had, he would have been permitted

to do so. (*Id.* at 21-22.) Brown was not handcuffed before or during the interview. (*Id.* at 22.)

At one point, SA Pitzen did not understand Brown's response to a question, which prompted her to remind Brown that he did not have to answer her questions. (*Id.* at 22.) Accordingly, SA Pitzen reminded Brown that he did not have to answer her questions. (*Id.*) Brown continued to speak to SA Pitzen. (*Id.*) SA Pitzen again testified that Brown never provided any indication that he wanted to terminate the interview. (*Id.*)

During the interview, SA Pitzen testified that Brown asked her "something to the effect of how much time am I looking at." (*Id.* at 23.) In response, she "told Mr. Brown that if he was convicted of a crime, that the time that he did or didn't serve was up to the judge, it was not up to me." (*Id.* at 23.) Furthermore, SA Pitzen explained to Brown "in a nutshell how the federal system works, sentencing, and how it is based on criminal history and loss amount." (*Id.*) SA Pitzen told Brown that she would try to answer his questions but reasserted that the judge had control over sentencing. (*Id.*) Moreover, SA Pitzen told Brown that she could not give him any legal advice and made no promises to him. (*Id.*)

SA Pitzen testified that she was aware of Brown's prior criminal history and familiar with Brown's work history at Number 1 Tax when the search warrant was executed. (*Id.* at 25.) SA Pitzen testified that Brown admitted to filing tax returns containing false information during the interview. (*Id.* at 26.) SA Pitzen later testified that Brown never told her that he committed a crime or asked how long he was going to prison. (*Id.* at 30.)

13

Brown was not arrested at the end of the interview. (*Id.* at 26.) SA Pitzen gave Brown a copy of the search warrant, the key to Number 1 Tax, and a copy of the inventory that listed items taken during the search warrant, including client files, computers, and various business records. (*Id.*) SA Pitzen testified that the interview was not audio recorded because of IRS policy. (*Id.* at 32.) Instead, SR Pitzen took notes during the interview and wrote a memorandum. (*Id.*) After the interview, SA Pitzen contacted Brown to arrange a time that she could return the computers. (*Id.* at 26.) The computers were returned the following morning. (*Id.* at 27.)

## II.    DISCUSSION

Brown moves to suppress all statements, admissions, and answers made during the investigation of Brown and Number 1 Tax. (Dkt. 22.) Brown also moves to suppress any physical evidence obtained as a result of the execution of a warrant on Brown's business in June of 2015. (Dkt. 23.) The Court addresses each motion below.

### A.    Motion to Suppress Statements, Admissions, and Answers

Brown seeks suppression of "all statements, admissions and answers made by the defendant during the course of this investigation." (Dkt. 22.) After the execution of the search warrant, SA Pitzen interviewed Brown at Number 1 Tax. (*See generally* Tr. 18.) The grounds for this motion include "[t]he nature of the encounter occurred during circumstances that were the functional equivalent of custodial interrogation, the interrogation was not preceded by a complete *Miranda* warning and accompanying knowing and intelligent waiver of those rights, and the statement was otherwise involuntary due to the circumstances of the encounter." (Dkt. 22 at 1.)

Brown declined to file any briefing in support of this motion. "Federal Rules of Criminal Procedure 12(b)(3)(C) and (e) provides that motions to suppress evidence must be raised before trial or are waived, and the waiver provision 'applies not only to the failure to make a pretrial motion, but also to the failure to include a particular argument in the motion.'" *United States v. Reynolds*, 720 F.3d 665, 673 (8th Cir. 2013) (quoting *United States v. Spotted Elk*, 548 F.3d 641, 656 (8th Cir. 2008)). "At minimum, it is defendant's burden to come forth with some evidence and argument to support his position that evidence, statements or a witness identification should be suppressed." *United States v. Rosetter*, No. 10-cr-83 (JNE/JSM), 2010 WL 5184991, at *23 (D. Minn. Oct. 1, 2010), *R.&R. adopted* 2010 WL 5173155, (D. Minn. Dec. 13, 2010) (citations omitted); *see also United States v. Edwards*, 563 F. Supp. 2d 977, 994 (D. Minn. 2008) (citations omitted) ("At the end of the day, as the moving party, at a minimum it is defendant's burden to come forth with some evidence and argument to support his position that evidence, statements or a witness identification should be suppressed."). "[E]ven in those circumstances where the Government has the ultimate burden of persuasion, Defendant has the initial burden of making a prima facie showing of illegality." *United States v. Starks*, 193 F.R.D. 624, 628 (D. Minn. 2000) (citation omitted). Brown's failure to provide the Court with any evidence or argument in support of his motion is a sufficient basis to recommend its denial. *See Rosetter*, 2010 WL 5184991, at *23.

Brown's motion also fails on its merits. "[*Miranda*] prohibits the government from introducing into evidence statements made by the defendant during a custodial

interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." *United States v. Chipps*, 410 F.3d 438, 445 (8th Cir. 2005) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). Thus, *Miranda* warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (quoting *Miranda*, 384 U.S. at 444). "Interrogation under *Miranda* includes not only express questioning but also its functional equivalent, such as 'any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Hull*, 419 F.3d 762, 767 (8th Cir. 2005) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980)). The law in the Eighth Circuit is that non-Mirandized "[s]tatements that are the product of a non-custodial interrogation may also be suppressed if the statements are not made voluntarily." *United States v. Clark*, No. 15-cr-154 DWF/LIB, 2015 WL 4964665, at *3 (D. Minn. Aug. 19, 2015) (citing *United States v. Brave Heart*, 397 F.3d 1035, 1040 (8th Cir. 2005) (considering the voluntary nature of a statement that was the product of noncustodial questioning)). As such, the Court will proceed with analyzing: (1) whether the interview of Brown amounted to a custodial interrogation that would have required SA Pitzen to provide him with his *Miranda* rights before interviewing him; and (2) if the interview was not a custodial interrogation requiring *Miranda* rights, whether the statements were made voluntarily.

### 1.    Custodial Interrogation

The Court concludes that SA Pitzen's questioning of Brown was not custodial, and therefore a *Miranda* warning was not required. "A custody determination requires the court to carefully assess 'the totality of the circumstances.'" *United States v. Axsom*, 289 F.3d 496, 500 (8th Cir. 2002) (quoting *United States v. Hanson*, 237 F.3d 961, 963 (8th Cir. 2001)). The Eighth Circuit has identified six representative indicia which tend to mitigate or aggravate the atmosphere of custodial interrogation:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*Id.* The first three mitigate against the existence of custody and the last three aggravate the existing of custody. *Id.* at 500-01.

Here, before the interview began, SA Pitzen testified that she read Brown his noncustodial rights verbatim. (Tr. 17, 30; *see* Gov't Ex. 9 (IRS "Non-Custody Statement of Rights".)) Brown responded that he understood his rights. (Tr. at 18.) Additionally, SA Pitzen reminded Brown that he did not have to answer any questions, was not under arrest, and could speak to an attorney if he wanted to. (*Id.* at 22.) SA Pitzen told Brown that he was free to leave the interview, and there is no evidence that anyone prevented Brown from doing so. (*Id.* at 18.) The evidence indicates that Brown was not

handcuffed during the questioning and his access to the door was not blocked.  (*Id.* at 18, 22.)  Brown has not identified any facts suggesting he was not permitted to leave or believed he was not permitted to leave, or otherwise suggesting that SA Pitzen's questioning was custodial.  Having considered the totality of the circumstances, the Court concludes that Brown's interview was not the functional equivalent of custodial interrogation that would require a *Miranda* warning.  *See Stansbury v. California*, 511 U.S. 318, 322 (1994) ("An officer's obligation to administer Miranda warnings attaches, however, only where there has been such a restriction on a person's freedom as to render him in custody.") (cleaned up).

### 2.    Voluntariness of Statements

The Court also concludes that Brown's non-custodial statements were voluntary. In the context of the non-custodial statement to law enforcement, the Eighth Circuit has concluded:

> A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination.  We determine if a defendant's will has been overborne by examining the totality of the circumstances, including both the conduct of law enforcement in exerting pressure to confess on the defendant and the defendant's ability to resist that pressure.

*Brave Heart*, 397 F.3d at 1040 (marks and citations omitted); *see also Clark*, 2015 WL 4964665, at \*5.  The Government must prove by a preponderance of the evidence that the defendant's statements were voluntary.  *See Brave Heart*, 397 F.3d at 1040 (citation omitted).

The Court finds that there is nothing in the record before the Court to indicate that SA Pitzen employed any strong-arm tactics, threats, violence, or any other coercive acts overbearing Brown's will and made no promises while talking to Brown. To the contrary, Brown answered questions freely, he never indicated he did not want to answer questions or end the interview, he never asked to speak with a lawyer, and he was told several times that he did not have to answer questions. (Tr. at 21-22.) Moreover, SA Pitzen's explanation of how the federal system and possible sentencing works did not overbear Brown's will to voluntarily speak. *See Dowell v. Lincoln Cty., Mo.*, 762 F.3d 770, 776 (8th Cir. 2014) ("An officer, however, may make a truthful statement regarding a possible punishment without it overbearing a defendant's will."). For the reasons set forth above, the Court finds that Brown's non-custodial statements to SA Pitzen were voluntary. Therefore, the Court recommends that Brown's Motion to Suppress Statements, Admissions, and Answers (Dkt. 22) be denied.

**B.    Motion to Suppress Evidence Obtained as a Result of a Search Warrant**

Brown challenges the search warrant application on its "four corners" as 1) not supported by probable cause because the alleged facts in the affidavit are "speculative and tenuous" and contain "unsupported conclusory allegations about business practices and no specifics as to any individual tax returns"; and 2) is overly broad and lacking in particularity such that it amounts to an improper general warrant. (Dkt. 37 at 1.) Brown also argues that evidence obtained as a result of the warrant must be suppressed because it is so defective that it is not entitled to the "good faith" exception to suppression set forth in *United States v. Leon*, 468 U.S. 897 (1984). (*Id.*) The Government contends that

the warrant is supported by probable cause and not overly broad or lacking in particularity. (Dkt. 42 at 15-16.) The Government also argues that the *Leon* exception applies to this case, and suppression is not required. (*Id.*)

### 1.     Legal Standard

The Fourth Amendment provides that "the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.

### a.     Probable cause requirement

The Eighth Circuit has explained that "[a]n affidavit for a search warrant need only show facts sufficient to support a finding of probable cause." *United States v. Parker*, 836 F.2d 1080, 1083 (8th Cir. 1987). "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *United States v. Colbert*, 605 F.3d 573, 576 (8th Cir. 2010) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)). "The existence of probable cause depends on whether, in the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (quoting *United States v. Murphy*, 69 F.3d 237, 240 (8th Cir. 1995) (quoting, in turn, *Gates*, 462 U.S. at 238)).

The sufficiency of a search warrant affidavit is examined using "common sense and not a hypertechnical approach." *United States v. Grant*, 490 F.3d 627, 632 (8th Cir. 2007) (citation and internal quotations omitted). "Therefore, '[w]hen the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, only that information

which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" *United States v. Wiley*, No. 09-cr-239 (JRT/FLN), 2009 WL 5033956, at *2 (D. Minn. Dec. 15, 2009) (quoting *Solomon*, 432 F.3d at 827) (alterations in original). "In ruling on a motion to suppress, probable cause is determined based on 'the information before the issuing judicial officer.'" *United States v. Smith*, 581 F.3d 692, 694 (8th Cir. 2009) (quoting *United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986)). Nevertheless, "[a] magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'" *Gates*, 462 U.S. at 236 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969), *abrogated on other grounds*, *Gates*, 462 U.S. 213). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Gates*, 462 U.S. at 238-39 (alteration in original) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

### b.    Overbreadth and particularity

The Fourth Amendment provides that "no Warrants shall issue . . . [unless] **particularly describing** the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV (emphasis added). The Fourth Amendment's particularity requirement avoids "a general, exploratory rummaging in a person's belongings." *Andresen v. Maryland*, 427 U.S. 463, 480 (1976) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)). This particularity requirement applies to the person suspected of the offense and the persons or things to be seized. *United States v. Grubbs*, 547 U.S. 90, 96 (2006).

Courts judge compliance with the particularity requirement according to "a standard of practical accuracy rather than a hypertechnical one." *United States v. Fiorito*, 640 F.3d 338, 346 (8th Cir. 2011) (internal quotation marks omitted). "The [F]ourth [A]mendment requires that a search warrant's description of the evidence to be seized be 'sufficiently definite so as to enable the officer with the warrant to reasonably ascertain and identify the place to be searched and the objects to be seized.'" *United States v. Frederickson*, 846 F.2d 517, 519 (8th Cir. 1988) (quoting *United States v. Muckenthaler*, 584 F.2d 240, 245 (8th Cir. 1978)). How specific a warrant must be varies "depending on the circumstances and the type of items involved." *Frederickson*, 846 F.3d at 519 (internal quotations omitted). As such, courts do not resolve issues concerning particularity "in a vacuum. The court will base its determination on such factors as the purpose for which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the case." *Fiorito*, 640 F.3d at 346 (internal quotation marks omitted).

Although courts sometimes treat particularity and breadth synonymously, *see, e.g.*, *Kiesling v. Holladay*, 859 F.3d 529, 537 (8th Cir. 2017) ("The Fourth Amendment's particularity requirement commands that an overbroad warrant is not saved if probable cause is lacking for only some, but not all, of the items to be searched."), technically speaking, particularity and breadth of a warrant are separate issues, *see In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847, 856-57 (9th Cir. 1991) ("Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the

warrant is based.") (citation omitted); *United States v. Adams*, No. 17-cr-64

(DWF/KMM), Dkt. No. 221 (D. Minn. Sept. 17, 2018), *R&R adopted*, 2018 WL 6445547

(D. Minn. Dec. 10, 2018).

      **2.**    **Search Warrant**

          **a.**    **The warrant was supported by probable cause**

Brown argues the search warrant for Number 1 Tax was not supported by probable

cause because the allegations in the search warrant application were conclusory and

lacked "specific factual detail concerning what might be discovered at the offices of

Number 1, since it fails to identify any specific individual client returns at issue" and did

not "provide any details concerning any individual returns sufficient to tie the office to

any specific alleged crime relating any specific tax returns." (Dkt. 37 at 6.) The

Government responds that there was sufficient probable cause to search Number 1 Tax's

office for evidence of the crimes of aiding or assisting in the preparation of false or

fraudulent tax returns; conspiracy to defraud the government with respect to claims; fraud

and false statements; and false, fictitious or fraudulent claims, including the analysis

showing "that a substantial percentage of the 2013 and 2014 tax returns filed by Number

1 Tax on behalf of clients contained questionable information and indications of fraud."

(Dkt. 42 at 9.)

The Court finds that the search warrant was supported by probable cause. SA

Pitzen stated in her affidavit that the IRS analyzed tax returns from the 2014 and 2015

filing seasons using Number 1 Tax's EFIN and its employees' PTINs and found that a

number of tax returns transmitted to the IRS during the 2014 filings season contained

"questionable information and indications of fraud" and resembled suspicious returns prepared by the tax preparing entity where Brown had previously worked. (Gov't Ex. 1, Affidavit at 1, 4.) The affidavit described in detail some of the information and indications, including the fact that 98% of the returns filed by Number 1 Tax resulted in a refund, that 69% of the returns claimed the Earned Income Tax Credit ("EITC"), that 42% of the tax returns included Schedule C income (nearly all of which also claimed the EITC), and that 93 of the returns reported wages and/or withholding amounts that did not verify with the employer data the IRS had on file, at least 25 of which reported in higher wages or withholding amounts, often increasing the refund.[2] (*Id.* at 6-8.) The affidavit described a similar analysis for returns filed during the 2015 filing season (excluding the wage and withholding amounts comparison). (*Id.* at 8-9.)

The affidavit explained why, based on SA Pitzen's knowledge and experience, the analysis was indicative of fraud, including because "reporting false Schedule C business income is a common method that unscrupulous tax return preparers use to increase their clients' refunds by manipulating the earned income of the client in order to increase or qualify clients for refundable credits such as the American Opportunity Credit, the Child Tax Credits, and EITC, all of which are based, in part, on the amount of earned income a taxpayer reports." (*Id.* at 6-7.) It also described an undercover operation from January 27, 2015, that recorded Brown preparing and filing federal and state tax returns for a UCA in which he inflated the UCA's income, resulting in an increased refund, and also

---

[2]     The affidavit stated that Number 1 Tax filed more than 450 federal individual income tax returns during the 2014 and 2015 filing seasons. (Gov't Ex. 1, Affidavit at 5.)

offering the UCA an opportunity to earn a "commission" by seeking additional clients. (*Id.* at 14.)  Finally, the affidavit stated that the personal returns of Brown, Karn, and Williams contained questionable information and indicia of fraud.  (*Id.* at 11-12.)

The Court concludes that there was a fair probability that evidence of fraudulent tax activity would be found in the records of Number 1 Tax based on the IRS analysis of the returns filed during the 2014 and 2015 filings seasons, the undercover operation involving Brown, which corroborated the analysis of the returns, the description of the questionable information in the personal returns of Brown, Karn, and Williams, and Brown and Karn's previous employment at a tax preparer identified by the IRS as preparing questionable returns.  Further, in view of the fact that affidavit described potentially fraudulent activity encompassing a substantial number of the 450 returns filed during the 2014 and 2015 filing seasons, indicating that the alleged fraud permeated Number 1 Tax's entire business, the Court concludes that the affidavit need not identify specific individual tax returns at issue.  Consequently, the Court finds the search warrant was supported by probable cause.

> **b.    The warrant was neither overly broad nor lacking in particularity**

Brown also argues the search warrant was overly broad, lacked particularity, and sought to search and seize "virtually every piece of paper and all electronic stored data without limitation."  (Dkt. 37 at 7-8.)  Thus, according to Brown, the warrant permitted a general exploratory search of all the computers and files at Number 1 Tax "without specifying or limiting the search to evidence of a crime."  (*Id.* at 9.)  The Government

responds that the warrant was not overly broad in view of the documents needed to "elucidate the genesis, scope and perpetrators of the fraud at the business (Dkt. 42 at 14-15) and that warrant was sufficiently precise to enable the agents executing it to identify the items authorized to be seized in view of the fact that this is a case involving "extensive" fraud (*id.* at 12-14).

The Court first considers Brown's reliance on *United States v. Winn*, 79 F. Supp. 3d 904 (S.D. Ill. 2015). This case is readily distinguishable from *Winn*. In *Winn*, the warrant authorized the search of a personal cell phone and the seizure of "any and all files" that were evidence of the crime of public indecency. 79 F. Supp. 3d at 919. The problem was that "[b]ased on the complaint supporting the search warrant, there was probable cause to believe that only two categories of data could possibly be evidence of the crime: photos and videos." *Id.* The warrant, however, authorized seizure of the calendar, phonebook, contacts, SMS messages, MMS messages, emails, ringtones, audio files, all call logs, installed application data, GPS information, WIFI information, internet history and usage, or system files—or as the court described it, "virtually every type of data" on the phone. *Id.* at 919-20. Here, the warrant authorized the search of "the business premises of Number 1 LLC" where the items "requested to be seized" were client files, records reflecting the amount of refunds claimed or received on client tax returns, financial documents relating to Number 1 Tax, employee records, workpapers, and other records that constituted evidence of violations of 26 U.S.C. §§ 7206(1) and 7206(2) and 18 U.S.C. §§ 286 and 287, as well as computers and/or word processors, and evidence of who used, owned, or controlled any electronic devices on the premises.

(Gov't Ex. 1, Attachments A & B.)  The Court concludes that the items to be seized from business premises are not analogous to the "any and all files" seized from a personal cell phone in *Winn*.

Brown also contends there were "no facts justifying a blanket search of all computers and files at Number 1" and that "[t]he scope of the search was random and without factual support, based as is its conclusory claim that there might be evidence of crime sought by reviewing virtually any and all records and all digital data."  (Dkt. 37 at 9.)  The Court disagrees.  In *United States v. Kail*, the Eighth Circuit explained: "While the search warrant in this case was broad in the sense that it allowed inspectors to seize almost all of the business records of Coin & Stamp Gallery, we would conclude that under the particular facts of this case the scope of the warrant was justified.  This is because it would not be possible through a more particular description to separate those business records that would be evidence of fraud from those that would not since there was probable cause to believe that fraud permeated the entire business operation."  804 F.2d 441, 445 (8th Cir. 1986).  Here, the affidavit alleges a fraud scheme that encompasses a substantial portion of the returns filed by Number 1 Tax during the 2014 and 2015 filing seasons and involved the three employees who prepared the returns.  The Court concludes that the scope of the warrant was permissible in view of those facts.  *See Andresen v. Maryland*, 427 U.S. 463, 481 n.10 (1976) ("Under investigation was a complex real estate scheme whose existence could be proved only by piecing together many bits of evidence.  Like a jigsaw puzzle, the whole 'picture' of petitioner's false-pretense scheme with respect to Lot 13T could be shown only by placing in the proper

27

place the many pieces of evidence that, taken singly, would show comparatively little. The complexity of an illegal scheme may not be used as a shield to avoid detection when the State has demonstrated probable cause to believe that a crime has been committed and probable cause to believe that evidence of this crime is in the suspect's possession.").

As to particularity, "a search warrant involving a scheme to defraud is sufficiently particular in its description of the items to be seized if it is as specific as the circumstances and nature of the activity under investigation permit." *United States v. Saunders*, 957 F.2d 1488, 1491 (8th Cir. 1992) (cleaned up). Here, the warrant identifies the items to be seized as "the property and evidence related to Number 1, LLC" for a specific time period and "any other records maintained" at the property address "for or related to Number 1 Tax" and any others relating to Number 1 Tax "all of which are evidence of violations of [26 U.S.C. §§ 7206(1) and 7206(2) and 18 U.S.C. §§ 286 and 287]." (Gov't Ex. 1, Attachment B.) The search warrant here is similar to the warrant in *Fiorito*, which sought "[e]ntire files involving [Fiorito]" where Fiorito was alleged to have engaged in "an ongoing, well-defined equity-stripping scheme" and the broad phrase was followed by "an extensive list of specific documents." 640 F.3d at 346-47 (alterations in original). Based on the circumstances of the fraud at Number 1 Tax specified in the affidavit, the government could not reasonably distinguish fraudulent records from others during the search. *See Kail*, 804 F.2d at 445 ("For use involving a scheme to defraud, . . . a search warrant is sufficiently particular in its description of the items to be seized if it is as specific as the circumstances and nature of activity under investigation permit.") (internal quotation marks omitted). Accordingly, the search

warrant places reasonable constraints on the records to be searched for and seized under the circumstances, and thus satisfies the particularity requirement.

### c.    The good-faith exception applies

As discussed above, the Court concludes that the search warrant was supported by probable cause and that the warrant was sufficiently particular and not overly broad. Nevertheless, the Court addresses Brown's *Leon* argument with respect to the search warrant. Even if the search warrant was not supported by probable cause, the Court finds that the evidence would not need to be suppressed because the *Leon* good-faith exception applies.

Under *Leon*, "'evidence seized pursuant to a search warrant issued by a magistrate that is later determined to be invalid[] will not be suppressed if the executing officer's reliance upon the warrant was objectively reasonable.'" *United States v. Houston*, 665 F.3d 991, 994 (8th Cir. 2012) (quoting *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007)). However, evidence obtained as a result of an unconstitutional search should be suppressed under the following circumstances:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge;
>
> (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant;
>
> (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and
>
> (4) when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*Houston*, 665 F.3d at 995 (quoting *Proell*, 485 F.3d at 431). The Eighth Circuit has found that the *Leon* exception may apply to warrants that are insufficiently particular or overbroad. *See, e.g.*, *United States v. Henderson*, 416 F.3d 686, 695 (8th Cir. 2005) (affirming finding that good-faith exception applied to overly broad warrant); *Curry*, 911 F.2d at 77-78 ("[T]he *Leon* exception is not automatically inapplicable in every case where a warrant is found invalid on the ground that it is insufficiently particular.").

Here, none of these circumstances exist. As to the first, Brown presented no evidence that Judge Rau was misled by a false statement in the affidavit that SA Pitzen made knowingly and intentionally or with reckless disregard for its truth.

Second, Brown presented no evidence to suggest that Judge Rau "wholly abandoned his judicial role" at the time he issued the warrant.

As to the third, Brown contends that SA Pitzen only speculated that evidence of a crime would be found at Number 1 Tax and that "[g]ood faith does not shield the recovered evidence from suppression" because SA Pitzen's reliance on Judge Rau's determination of probable cause was "unreasonable." (Dkt. 37 at 11.) Relying on *United States v. Herron*, 215 F.3d 812 (8th Cir. 2000), Brown argues that the warrant application lacks probable cause as to specific tax returns and specific client files. (*Id.* at 11-12.) As previously discussed, the supporting affidavit provided probable cause for the search of Number 1 Tax. *See* section II.B.1.a, *infra*. The supporting affidavit describes multiple indications of fraud discovered by the IRS and contains other detailed statements in the affidavit regarding the IRS's undercover operation and the questionable individual returns of Brown, Karn, and Williams. Even if these statements were insufficient to

constitute probable cause, the affidavit, when considered in its entirety, is not speculative or so lacking in indicia of probable cause as to render official belief in its existence unreasonable.

Fourth, this Court finds that the warrant was not so facially deficient that no law enforcement officer could reasonably presume it to be valid.  The warrant identified the place to be searched by business name and address and described the items to be seized in sufficient detail, including the types of records and the crimes for which evidence was sought.  Consequently, the fourth *Leon* circumstance is not present.  Accordingly, the Court recommends denial of this motion on the alternative ground that the *Leon* exception applies.

## III.    RECOMMENDATION

Based on the files, records, and proceedings herein, **IT IS RECOMMENDED THAT:**

1. Defendant's Motion to Suppress Statements, Admissions, and Answers (Dkt. 22) be **DENIED**.

2. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. 23) be **DENIED**.


DATED: September 20, 2019                    *s/Elizabeth Cowan Wright*
                                             ELIZABETH COWAN WRIGHT
                                             United States Magistrate Judge

## <u>NOTICE</u>

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).